Emma EDWARDS, Individually, For and On Behalf of the Heirs–At–Law, and as Administratrix of the Estate of Kenneth Edwards, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 88–4193–R.

United States District Court, D. Kansas.

Oct. 11, 1990.

Tom Kelley, Ochs, Kelley & Luttjohann, Topeka, Kan., for plaintiff.

Benjamin L. Burgess, Jr., U.S. Atty., Connie R. DeArmond, Asst. U.S. Atty., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This is a Federal Tort Claims Act case. Plaintiff is bringing this action as an individual, as a representative of the heirs of Kenneth Edwards, and as the administratrix of the Estate of Kenneth Edwards. Plaintiff alleges that Kenneth Edwards died as a result of medical malpractice at the Colmery–O'Neil Veterans Administra-

tion Medical Center (VAMC) in Topeka, Kansas. More specifically, this case concerns the treatment of Kenneth Edwards, a schizophrenic, with high doses of a drug called Loxitane. This case was tried to the court in September 1990. Following the trial, both sides submitted findings of fact and conclusions of law. After a review of the evidence and the parties' submissions, the court hereby makes the following findings of fact and conclusions of law.

1. Kenneth Edwards was born July 11, 1932 and died February 1, 1986.

2. Kenneth Edwards married plaintiff Emma Edwards on September 14, 1955, while Kenneth Edwards was enlisted in the United States Army.

3. In 1958, while on active duty in Korea, Kenneth Edwards had a nervous breakdown. He was later diagnosed as suffering from schizophrenia, paranoid type.

4. Kenneth Edwards was transferred to Fitzsimmons Army Hospital in Colorado, where he received treatment for his illness. On December 16, 1959, he was transferred and admitted to the VAMC in Topeka, Kansas. His wife and family, a daughter and stepdaughter, settled in Topeka.

5. From 1961 until 1969, Kenneth Edwards was treated at the VAMC on an outpatient basis, although numerous hospital admissions were interspersed in this period. From December 1969 until 1978, Kenneth Edwards was placed in a group living environment in Topeka. He was away from his family, although he maintained contact with them.

6. In the fall of 1978, Mr. Edwards moved to Kansas City where he found work as a painter. His condition was followed on an outpatient basis. In February 1980, he was briefly admitted to the Kansas University Medical Center. He left the hospital against medical advice and returned to Topeka. He had another brief hospital admission at VAMC and then resumed outpatient treatment.

7. Kenneth Edwards returned to Kansas City in 1981. He was hospitalized at the V.A. Medical Center in Kansas City in August 1981, but once again left without permission. Eventually, in December 1981, after his condition had deteriorated, Kenneth Edwards returned to Topeka and was readmitted to VAMC.

8. The chief physician in charge of Kenneth Edwards' treatment at VAMC at this time was Dr. George Penn.

9. Dr. Penn decided to prescribe Loxitane for Mr. Edwards. Loxitane is a neuroleptic drug used in the treatment of schizophrenia. Loxitane, like other neuroleptic drugs prescribed for schizophrenia, supposedly has the effect of blocking dopamine, a brain neurotransmitter which is known to interfere with the transmission or processing of information. This reduces delusional thinking. Previously, Mr. Edwards had taken numerous other neuroleptic medications. The decision to use Loxitane apparently was reached because Mr. Edwards was suffering a relapse of delusional behavior, and he refused to continue taking other neuroleptic drugs, such as Haldol.

10. Among neuroleptic drugs, Loxitane is considered to have low to intermediate potency. There are adverse side effects to all neuroleptic drugs, including Loxitane. Unlike some neuroleptic medications, Loxitane is not considered cardiotoxic, although it has been linked to tachycardia, which is a quickening of the pulse.

11. Kenneth Edwards was started on a low dose of Loxitane which was gradually increased until a clinical effect was observed; that is, until his delusions subsided. An attempt was made to reduce the dosage, but the delusions returned. In Mr. Edwards' case, a clinically effective dose greatly exceeded the manufacturer's recommended maximum dose, which was 250 mg. a day. From January 29, 1982 to the end of that year, Mr. Edwards' dosage fluctuated between 300 and 500 mg. per day. The dosage stabilized at 400 mg. in 1983 until Mr. Edwards was released from VAMC on May 31, 1983. Shortly after his release, Mr. Edwards' dosage was increased to 500 mg. Mr. Edwards continued taking 500 mg. of Loxitane every day, probably until the day of his death, Febru-

ary 1, 1986. At one point, Mr. Edwards was encouraged to reduce his dose to 450 mg. per day. But this was not done. There is also evidence that his prescription was reduced to 300 mg. two weeks before Kenneth Edwards died. But, there is no doctor's order on record for such a reduction, and there is no other testimony or evidence that he was seen taking fewer pills.

12. Mr. Edwards appeared able to tolerate the side effects of Loxitane, and his mental condition improved and stabilized after he started receiving high doses of Loxitane. In fact, his delusions—for instance, thoughts that he was President or a famous neurosurgeon—never returned after high doses of Loxitane were administered. He began living with his family again when he was released from VAMC in May 1983. Every weekday he visited VAMC for counseling. His family members, particularly plaintiff Emma Edwards, also received counseling. The counseling assisted the Edwards family to adjust and cope with Kenneth Edwards' illness, and it helped avert further inpatient treatment of Kenneth Edwards. Indeed, the evidence suggests that the years 1983, 1984 and 1985 were the happiest years in the marriage of Kenneth and Emma Edwards since Kenneth Edwards' nervous breakdown.

13. On December 15, 1985, Kenneth Edwards was admitted to VAMC with symptoms of anxiety. His family members testified at trial that increasingly in 1985, Mr. Edwards complained that his heart pounded, his head hurt, and that he could not sleep. He began pacing at home; his hands were more tremulous than usual; he shuffled his feet and dragged one leg; and his urination was excessive. These symptoms either were not observed or not considered important by the VAMC staff who saw Mr. Edwards every weekday. There is no medical record, for instance, that Mr. Edwards complained of his heart pounding. After Mr. Edwards was hospitalized on December 15, 1985, the medical staff concluded that he was suffering from anxiety over events at home and that he needed the structured environment of the hospital to sort out his thoughts. Mr. Edwards was released from the hospital on December 20, 1985.

14. On December 27, 1985, Mr. Edwards was again hospitalized at VAMC with basically the same complaints. The medical staff reached the same conclusions concerning his treatment. He was maintained on Loxitane and eventually released from the hospital, at the request of he and Mrs. Edwards, to return home on January 17, 1986.

15. On February 1, 1986, a Saturday, plaintiff Emma Edwards left in the morning to make a shopping excursion to the PX at Leavenworth, Kansas. She saw nothing unusual concerning her husband's condition at that time. When she returned home in the evening, she found Kenneth Edwards lying on the floor dead. Mr. Edwards was 53 years old when he died.

16. Kenneth Edwards died of sudden heart failure. Plaintiff asserts that Kenneth Edwards' death was caused by excessive doses of Loxitane and poor monitoring of Kenneth Edwards' medical condition. Defendant denies that Loxitane was a factor in Kenneth Edwards' death and contends that he received excellent care. In defendant's view, heart disease was the probable cause of Kenneth Edwards' death.

17. After Kenneth Edwards died, he was embalmed. Consequently, when an autopsy was later ordered, no blood tests could be done to determine the level of Loxitane in his system. Dr. Hilda D'Amico performed the autopsy. Her "final pathological diagnoses" were listed as follows:

1. Sudden death on a chronic schizophrenic taking Loxitane (Dibenzoxazepine) and Cogentin (Benztropine) only.

2. Cardiovascular system

   a. Minimal cardiomegaly with focal interstitial fatty infiltration, arteriolar hypertrophy and occasional foci of coagulative myocytolysis, subendocardium.

   b. Pulmonary edema and congestion, moderate

   c. Patchy coronary atheromatosis. RCA dominance.

d. Pericardial papillary mesothelial hyperplasia, benign, nonspecific

3. Miscellaneous

a. Chronic erosive esophagitis.

b. Massive dilatation of bladder and mild bilateral pelvic dilatation, more marked on right side, most probably secondary to antipsychotic medication

c. Aortic atheromatosis, moderate

Dr. D'Amico's report also noted: "Prostate with a few relatively soft nodules." In a "final note" the doctor concluded:

Regarding death, autopsy was inconclusive. He [Edwards] did have some cardiomegaly with fatty infiltration, thickened arterioles and few scatter foci of subendocardial "band necrosis." The latter raised question of ventricular fibrillation since other possible explanations such as acute myocardial infarction and acute coronary obstruction were ruled out.

So, Dr. D'Amico could make no conclusion regarding the cause of death.

18. Dr. William Eckard, an eminent forensic pathologist, reviewed the autopsy in this case, as well as tissue slides, VA records, and the deposition of plaintiff's expert witness. He noted that Kenneth Edwards was obese, that he smoked 2½ packs of cigarettes a day, and that his heart was moderately enlarged. He concluded that Mr. Edwards had severe coronary artery disease that had developed over a long period of time. His opinion was that Mr. Edwards died from the problems of heart disease. He found nothing which would link Loxitane to these problems. Dr. Eckard admitted that Mr. Edwards did not complain to *doctors* of heart symptoms prior to his death, but the doctor did not consider this unusual.

19. Plaintiff's expert in this case was Dr. Horace Whittington. Dr. Whittington is a well-qualified psychiatrist who has treated patients with Loxitane. He is board certified in clinical and administrative psychiatry. He stopped practicing psychiatry in 1987 and currently administers mental health and substance abuse programs for the Prudential Insurance Company. Dr. Whittington is not a pathologist.

He reviewed the autopsy report in this case, as well as medical records and depositions. He did not review the tissue slides from the autopsy. Dr. Whittington testified that the most likely cause of death was a rhythm disturbance of the heart caused when Loxitane blocked the parasympathetic nervous system and left the sympathetic nervous system unopposed, leading Mr. Edwards' heart to race uncontrollably. Dr. Whittington noted that the autopsy report listed ventricular fibrillation as a possible explanation for Kenneth Edwards' death.

20. As evidence in support of his theory, Dr. Whittington pointed to the massive dilatation of the bladder and mild pelvic dilatation (referring to the pelvis of the kidney). Dr. Whittington considered this evidence of a block of the parasympathetic nervous system, leading to urinary retention and, consequently, the expanded bladder and pelvis of the kidney. Again, Dr. Whittington referred to the autopsy report which suggested that the bladder dilatation may have been secondary to Mr. Edwards' antipsychotic medication. Dr. Whittington also considered Mr. Edwards' complaints to his family of a pounding heart as substantiation for his position.

21. The court finds that there is a preponderance of the evidence that Loxitane did not cause Kenneth Edwards' heart failure. First, we note that every medical witness with knowledge of Loxitane testified that there have been no reported cases of sudden or unexpected death of persons taking Loxitane. Nor is Loxitane considered more dangerous to the heart than other neuroleptic drugs. Generally, Loxitane is considered safe and well-tolerated. Studies have been conducted where doses above the manufacturer's maximum recommended dose were administered. There is no evidence before this court that the studies found that high doses led to heart problems. There have been cases of sudden or unexpected death of persons taking other neuroleptic drugs. But, whether the drugs caused the death of these persons is not known for certain. Second, we consider it significant that there was an absence of other symptoms, such as confusion or delir-

ium, indigestion, goose bumps, dilated pupils or fever, which might be linked to the breakdown or blockage of the parasympathetic nervous system. Mr. Edwards apparently was feeling well on the morning of the day of his death. Symptoms observed by his relatives during the months preceding his death, such as restlessness, headaches and insomnia, are characteristics of schizophrenia, but are not linked to Loxitane. A shuffling gait and hand tremors were observed by Mr. Edwards' family and are considered side effects of Loxitane, but these symptoms do not signify a dangerous condition. The complaints of a pounding heart were not made to doctors at VAMC, nor was a pounding heart detected when Mr. Edwards was in the hospital, shortly before his death. We also reject the contention that Mr. Edwards' dilated bladder was caused by high doses of Loxitane. The most persuasive explanation of Mr. Edwards' dilated bladder came from the veteran pathologist, Dr. Eckard, who testified that Mr. Edwards had a prostate condition which caused the dilatation of his bladder. In sum, the claim that Mr. Edwards' nervous system malfunctioned and caused heart failure because of Loxitane is unsupported by other physical evidence.

■ 22. The third reason for rejecting plaintiff's theory as to the cause of Kenneth Edwards' death is that Mr. Edwards did not die sooner. Mr. Edwards had been taking high doses of Loxitane since January 1982—four years before his death. If Loxitane caused Mr. Edwards' heart to fail, there is no reason why heart problems did not arise sooner. It was suggested by plaintiff's expert, Dr. Whittington, that Mr. Edwards' increasing age corresponded with a decreased rate of metabolizing the drug. While this may be true, generally the metabolism rate decreases gradually with age. We do not believe, given the other evidence in this case, that Mr. Edwards' metabolism slowed so much over four years that he could no longer tolerate high doses of Loxitane. We note that Dr. Neil Roach, a practicing board certified psychiatrist from Wichita, Kansas, testified that a person's metabolism would not change significantly over a three or four year period.

23. The final reason for rejecting plaintiff's theory of causation is the failure of the pathologists who have been involved in this matter to find that high doses of Loxitane caused Kenneth Edwards' death. Dr. D'Amico, who performed the autopsy on Kenneth Edwards, could not determine a cause of Mr. Edwards' heart failure. Dr. Eckard, who reviewed the autopsy materials, could not link Mr. Edwards' heart problems to Loxitane.

24. To conclude our discussion of the causation question, we acknowledge that Loxitane may have a cardiovascular effect such as tachycardia, hypertension or hypotension. We further acknowledge that Dr. D'Amico raised the question of ventricular fibrillation as the cause of Kenneth Edwards' heart failure. We also recognize Dr. Whittington's hypothesis of causation. But, we consider this evidence outweighed by the above-described evidence and reasons which oppose any link between Kenneth Edwards' death and Loxitane.

25. We also reject plaintiff's claims of negligence. At root, plaintiff does not claim that the administration of high doses of Loxitane departed from a reasonable standard of care. It is undisputed that the manufacturer's recommended maximum dosage as carried forward in the Physician's Desk Reference does not establish the standard of care in this case. Plaintiff's claim of negligence appears to focus on the failure to closely monitor Kenneth Edwards' condition and the failure to more actively attempt to reduce the dosage of Loxitane.

■ 26. From January 1982 through May 1983, while Kenneth Edwards was hospitalized, we can presume that his condition was closely monitored. Attempts were made at this time to find the lowest dose of Loxitane that would control Mr. Edwards' delusions. A dose of 400 mg. appeared to be the lowest clinically effective dose. After Mr. Edwards was released from the hospital in May 1983, the dose was increased to 500 mg. to help Mr. Edwards cope with the stress of life outside the hospital. Although Mr. Edwards

was released from the hospital, he spent his weekdays from the morning until approximately 3:00 or 4:00 p.m. at VAMC where he was seen by social workers, nurses, and other staff. He had a general physical examination in January 1984 and January 1985. Of course, he was hospitalized twice in December 1985 and was not released until January 17, 1986. His vital signs were checked in the hospital, and it is logical to assume that he was more closely monitored by doctors. No EKGs were done during the time when Mr. Edwards took Loxitane. But, there were no heart symptoms which would have alerted a doctor to take an EKG. Nor was there any testimony that the failure to take an EKG violated the standard of care among doctors. Dr. Roach testified that he personally would have preferred to take an EKG. But, he denied that this represented the standard of care in the medical community at this time. On the basis of this evidence, the court concludes that the doctors at VAMC were not negligent in failing to more actively monitor Kenneth Edwards' condition. Mr. Edwards was seen virtually every day by someone who could have reported problems in his condition. He was hospitalized shortly before his death. Yearly physicals were given. We believe this level of monitoring meets or exceeds any reasonable standard of care. Even if the standard of care was breached in this respect, we do not believe the alleged deficiency in monitoring led to Mr. Edwards' death because there is no evidence that an EKG or more intense observation would have produced any change in Mr. Edwards' care or treatment.

■ 27. We also reject the claim that the doctors at VAMC were negligent in failing to take more aggressive measures to reduce Mr. Edwards' dosage of Loxitane. It is undisputed that a reasonable standard of care requires that doctors attempt to determine the minimum dose required to control psychotic behavior. In this case, the VAMC staff were criticized by Dr. Whittington for increasing the dose from 400 mg. to 500 mg. to help Mr. Edwards cope with increased stress, instead of attempting to add an anti-anxiety agent

to the 400 mg. dose of Loxitane. Dr. Whittington also criticized the practice of giving Mr. Edwards prescriptions for Loxitane which were good for six months. Furthermore, he thought the VA doctors should have *ordered* a reduction of Loxitane, rather than recommended or encouraged such a reduction, particularly in light of Mr. Edwards' increasing age.

28. We do not find that defendant was negligent for failing to reduce Kenneth Edwards' dose of Loxitane from 500 mg. Increasing the dose of Loxitane from 400 mg. to 500 mg. was apparently effective in preventing a recurrence of psychotic symptoms once Mr. Edwards was released from the hospital. Recurrent psychotic episodes are damaging to a patient and should be avoided. Therefore, we find that the VAMC medical staff was not negligent in failing to try an anti-anxiety agent instead of increasing the dose of Loxitane. Mr. Edwards was well-monitored during his outpatient treatment. Dr. Roach testified that it was common to give six-month prescriptions to chronically ill patients. Given these circumstances, we find no deviation from the standard of care in the use of six-month refills for Mr. Edwards. Nor can we ground a finding of negligence upon defendant's failure to order a reduction of dosage. Over a substantial period of time, an effective dosage had been determined in a manner consistent with the reasonable standard of care. Recommending a minor reduction in the dose to Mr. Edwards, rather than insisting upon such a reduction, was consistent with the valuable goal of obtaining a patient's cooperation and compliance with treatment. Mr. Edwards had demonstrated difficulty in this area in the past. Finally, as noted previously, we do not find that Mr. Edwards' advancing age was a significant consideration in this matter.

29. The substantive law of Kansas supplies the controlling legal principles in this case. *Richards v. U.S.*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ 30. Under Kansas law, to prevail upon a claim of medical malpractice, plain-

tiff must demonstrate that the medical staff at VAMC was negligent—in other words, that it departed from a standard of reasonable and ordinary skill and care in the treatment of Kenneth Edwards. *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 552 P.2d 885, 888–89 (1976). It is also necessary that plaintiff prove that defendant's negligence caused injury to Kenneth Edwards and, therefore, to plaintiff. *Natanson v. Kline*, 187 Kan. 186, 188, 354 P.2d 670 (1960).

██ 31. We find that plaintiff failed to prove by a preponderance of the evidence that Kenneth Edwards died because he received high doses of Loxitane or because of any other aspect of his treatment by the medical staff at VAMC. We further find that plaintiff failed to prove by a preponderance of the evidence that the medical staff at VAMC were negligent in their treatment of Kenneth Edwards.

Therefore, plaintiff's claims are denied and this case shall be dismissed.

IT IS SO ORDERED.